UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | Criminal No. 04-212-06 (GK) |
| CARLOS IVAN MENDES-MESQUITA, | : | **FILED** |
| Defendant. | : | APR 2 2 2008 |
| | | Clerk, U.S. District and Bankruptcy Courts |

## AMENDED MEMORANDUM OPINION

Defendant Carlos Ivan Mendes-Mesquita filed a Motion to Suppress Statements allegedly given by him to a Paraguayan SENAD Special Agent and to an American DEA Special Agent in violation of his rights under the Fifth Amendment of the United States Constitution. The Defendant is charged with Conspiracy to Manufacture and Distribute Five Kilograms or More of Cocaine Intending and Knowing That the Cocaine Will Be Unlawfully Imported into the United States. Upon consideration of the Motion, the Opposition, the supplementary Memoranda submitted by the parties, and the evidentiary hearing held on February 7 and 13, 2008, the Court concludes that the Motion should be **denied**.

I.      FINDINGS OF FACT

The Paraguayan Government had been investigating the actions of the Defendant, and his alleged accomplices, for at least six months prior to November 2004. As part of that investigation, a prosecutor had obtained search warrants authorizing the search and resulting arrests at issue in this case. On November 10, 2004, SENAD, the Paraguayan drug enforcement agency, began surveillance of a hidden air strip, located in a very isolated, rugged jungle area in the Carmelo Peralta District of Paraguay. On November 24, 2004, a small airplane landed at the Northern end of the air

strip. Several men got out of the plane, and other men from a near by camp arrived by pick-up truck and began to unload large packages. These packages were later found to contain 280 kilograms of cocaine.

The SENAD surveillance consisted of a land team and an air team. The teams had prior information that a plane would be landing with a large cargo of cocaine. As soon as the landing team saw the plane approach the air strip, it contacted the helicopter team located not far away. Before the helicopter team arrived, the land team identified themselves as police to those involved in the cocaine delivery. A gun fight immediately broke out. One of the SENAD Special Agents was shot in the forehead. One of the Defendant's men was wounded and eventually died at the scene. Eight men were arrested, including the Defendant Mendes-Mesquita.

Shortly after the gun battle ended, the helicopter landed at the southern end of the airstrip.[1] The helicopter contained eight individuals including the prosecutor in the case representing the Public Ministry.[2] The Prosecutor spoke to the people who had been arrested by the members of the land team, identified himself, read them the Judge's order authorizing their arrest, and read them their legal rights under Paraguayan law.[3] Defendant Mendes-Mesquita was sitting, hand-cuffed,

---

[1] There was some discrepancy in the testimony about how much time passed between the exchange of gun fire and the arrival of the helicopter. One witness testified it was 15-20 minutes and another testified that it was only "minutes." This slight discrepancy is of no moment to the Court's legal conclusions.

[2] Paraguayan law requires that the execution of warrants in this type of situation must be supervised by the prosecuting attorney.

[3] According to the testimony of the Public Ministry Prosecutor, the rights of detainees under Paraguayan law are remarkably similar to, and even stronger than, the rights accorded to detainees under American law. For example, even if the arrested person makes a knowing, voluntary and intelligent waiver of his right to remain silent, no questions may be asked of him until his
(continued...)

looking down and crying. The Prosecutor calmed him down and then learned the reason for his crying was that the person killed in the gun fire was his brother-in-law and close friend. Although upset about his brother-in-law's death, the Defendant was lucid and had no wounds.

It was a very hot and sunny day, and all of those arrested were moved into the shade from the plane's wings in order to keep them comfortable. Everyone was also given water. The Defendant was, pursuant to Paraguayan law, not interrogated on November 24, 2004. The next day, however, when he and his attorney were in the prosecutor's office, the Defendant was interrogated and refused to make any statements.

The SENAD agents, the Prosecutor, and those arrested remained on the landing strip for about six to seven hours. They were required to leave before nightfall because of the dangerousness of the area and the fact that it was close to the Brazilian border. Charges were filed against the Defendant on November 25 or 26, 2004, and he remained in a Paraguayan jail for eight months. He did not go to trial because of outstanding extradition requests from the United States and Brazil. Brazil ultimately dropped its request and extradition to the United States was granted. All the other individuals arrested at the landing strip have been convicted of drug offenses in the Paraguayan courts.

One of the SENAD Special Agents at the scene, a member of the landing team, was Special Agent Luis Alberto Rojas, who was the coordinator of the air team. Upon arrival at the scene, Special Agent Rojas apparently recognized the Defendant and said "it's been a long time." The Defendant cried out in pain and told Special Agent Rojas that he had been assaulted. Special Agent

---

[3](...continued)
attorney arrives.

Rojas promised the Defendant he would ensure his safety. However, the Defendant was assaulted again by the same person. That individual was a member of the Military Special Forces who had lost control of himself because of the wounding of one of his men. At that point, Special Agent Rojas ordered the attacker not to come near the Defendant, apologized to him for the attacks, moved him to a shady area, and stationed one or two men to protect the Defendant.

The Defendant indicated that he was not feeling well and asked for medication that was in his briefcase. Special Agent Rojas got the medication and gave it to the Defendant. He stayed and talked with the Defendant for an extended period of time. They discussed the drugs which had been found that day. The Defendant indicated that his son had nothing to do with the drug delivery. He also indicated that he made deliveries for other people and said that he was not a violent man. Special Agent Rojas testified credibly that he did not interrogate the Defendant, that the Defendant was calm and respectful during their conversation, and that their relationship was one of mutual respect. The Defendant appeared to Special Agent Rojas to be resigned to his fate. When the Defendant was extradited on June 27, 2005, the Defendant shook his hand and said "excellent job."

Special Agent Rojas noted that the Defendant, who is a Brazilian citizen, spoke a mixture of Portugese and Spanish. Special Agent Rojas testified credibly that the incident on November 24, 2004 was an operation run by the Paraguayan Government. While there had been intelligence obtained from other cooperating governments, such as Brazil and the United States, this was not a joint investigation with those countries.

The Defendant was turned over, pursuant to an extradition order, to two DEA Agents, Brian Dodd and Rob Zachariasiewicz (know as "Zach"). Dodd and his partner Zach had flown to Paraguay by commercial air liner, and transported the Defendant to the United States in a DEA plane. Before

the Defendant was turned over to the custody of DEA agents, he received a physical examination by a Paraguayan doctor who said he was in good health, and various paperwork was completed.

The trip to the United States was a lengthy one going from Asuncion to Lima, Peru to Bogota, Colombia to Guantanamo Bay to Dulles Airport. The trip took approximately 15-16 hours. During that time, the Defendant was handcuffed in front. The Defendant was offered food and water. There were bathroom facilities on the plane. At each of the stops mentioned, he was allowed to get out of the plane and walk around, although still handcuffed. The plane contained only the two pilots, Special Agent Dodd, Special Agent Zach, and the Defendant.

Before getting on the plane, the Defendant asked to talk to Special Agent Dodd about the case and his lack of involvement in it. Dodd told him to wait until takeoff and until he had explained his legal rights to him. Special Agent Dodd is very fluent in Spanish, has worked and traveled extensively in Colombia, Costa Rica, Panama, and Paraguay, and believed that he and the Defendant understood everything that they were saying to each other in Spanish. Dodd does not speak Portugese and does not speak a particular Paraguayan dialect consisting of Spanish and Portugese. Zach speaks no Spanish.

Twenty minutes after the plane took off, Special Agent Dodd read the Defendant his Miranda rights. The Defendant was calm, did not appear to be under the influence of any illegal substance, and seemed to be in "good shape." Special Agent Dodd went through the Miranda rights, contained on Government Exhibit 4, reading them line by line in Spanish to the Defendant. At first, the Defendant was reluctant to sign the waiver of those rights. Special Agent Dodd explained that he needed to sign the waiver before Special Agent Dodd could talk to him about the drug transactions. Defendant Mendes-Mesquita then signed the waiver.

Their conversation lasted only about 10 minutes, from 8:40 to 8:50 a.m. Special Agent Dodd was trying to enlist the Defendant's cooperation, in particular against Defendant Jose Maria Corredor-Ibague, aka "Chepe." The Defendant claimed that he was an enemy of Chepe, but vigorously denied that Chepe had been involved in the drug transactions of November 24, 2004. The Defendant admitted that he got cocaine from Colombia and sent it to Brazil, but denied sending it to the United States. When Special Agent Dodd said words to the effect that "I guess it doesn't matter to you whether they send it to Europe or the United States, so long as you get paid," the Defendant indicated that he did not wish to talk any further about the case. At that point, Special Agent Dodd ceased all questioning.

At about 1:00 p.m., the Defendant reopened the conversation about the case, denying again that Chepe was involved.[4] Special Agent Dodd asked the Defendant if he wanted to hear a tape recording of a telephone call which he had on his laptop computer. The Defendant assented and Dodd played a one to one and a half minute telephone conversation between two men. The Defendant admitted that he was one of the people on that telephone call, but said words to the effect of "I don't know that that was Chepe I was talking to."

Special Agent Dodd testified credibly that the operation of November 24, 2004 was solely a Paraguayan effort and that the DEA did not even learn of it until after the Defendant's arrest. He

---

[4] Defendant's counsel attempted to impeach Special Agent Dodd's testimony with his DEA 6, arguing that it was he, not the Defendant, who reopened the conversation. However, the DEA 6 does not indicate that Special Agent Dodd reopened the conversation. Rather, it omits to state who reopened the conversation and simply picks up at the point at which Special Agent Dodd asked the Defendant whether he would like to listen to a recorded telephone call. Hearing Tr. 53:15-20, 73:5-14. Inexplicably, defense counsel failed to clarify these important details. Because of her failure, Special Agent Dodd was not impeached and, therefore, his testimony remains uncontradicted.

did acknowledge that DEA shared information with the Paraguayan SENAD and cooperated with it, as it did with many other foreign governments' drug enforcement entities.

## II.  CONCLUSIONS OF LAW

A.  The Court concludes that the Motion to Suppress the statements given by the Defendant to Special Agents Luis Alberto Rojas should be **denied**. As indicated in the facts set forth above, there is absolutely no indication whatsoever that the Defendant's statements were not given voluntarily. Even though the Defendant had been assaulted by one of the SENAD agents, it was Special Agent Rojas who stationed another special agent to protect the Defendant, who moved him to a more comfortable place in the shade, and who retrieved his medication and gave it to the Defendant.

"The law is settled that statements taken by foreign police in the absence of Miranda warnings are admissible if voluntary." United States v. Yusef, 327 F.3d 56, 145 (2d Cir. 2003). See also United States v. Covington, 783 F.2d 1052, 1056 (9th Cir. 1985); United States v. Heller, 625 F.2d 594, 599 (5th Cir. 1980). In this case, the facts do not reveal any prolonged or serious physical abuse, nor do they reveal coercion of any kind, much less pressure to extract a statement from the Defendant. In short, there is simply no evidence that the Defendant's statements to Special Agent Rojas were anything but voluntary.

B.  The Court concludes that the Motion to Suppress the statements given by the Defendant to DEA Special Agent Brian Dodd must also be **denied**. As described above, Defendant indicated, before getting on the plane to the United States, that he wished to talk to Special Agent Dodd about the case. Special Agent Dodd refused to do so at that time and told the Defendant to wait until after the takeoff and after he had time to explain his legal rights to him.

At about 8:40 a.m., shortly after they boarded the plane, Special Agent Dodd did read the Defendant his Miranda rights.[5] The Defendant signed a card waiving those rights and talked to Special Agent Dodd for about 10 minutes. At a certain point, as soon as the Defendant indicated that he did not wish to talk any further about the case, Special Agent Dodd stopped the questioning.

At about 1:00 p.m., the Defendant initiated a conversation about the case and made the statements in question to Special Agent Dodd. In short, approximately four hours passed between when the Defendant was read his Miranda rights -- which were "scrupulously honored" -- and his reopening of the conversation with Special Agent Dodd about the case.

Our Court of Appeals has held that "[i]f a person in custody indicates that he wants to remain silent, he may not be questioned further, unless he initiates communication, or (1) a significant period of time has passed after the initial communication, (2) the suspect is given a fresh set of Miranda rights, and (3) the second interrogation concerns a crime that was not a subject of the first interrogation." United States v. Bogle, 114 F.3d 1271, 1274 (D.C. Cir. 1997) (emphasis added). Here, the accused himself did initiate further communication with the police not long after he had been read, and had acknowledged his understanding of, his Miranda rights. Given the particular facts and circumstances surrounding this case, and the background, experience and conduct of the accused, the Defendant's waiver of his Miranda rights was knowing and voluntary. Therefore, under Edwards v. Arizona, 451 U.S. 477, 482 (1981), as well as Bogle, the second set of statements given by the Defendant to Special Agent Dodd was not given in violation of the Fifth Amendment.

Defendant's counsel in her argument tried to suggest that her client does not speak traditional Spanish but rather a dialect which is a combination of Spanish and Portugese. However, there was

---

[5] Miranda v. Arizona, 386 U.S. 436 (1966).

simply no evidence to support what was merely an argument. Special Agent Dodd, who is fluent in Spanish and has traveled extensively throughout South America, testified credibly that he and the Defendant were speaking Spanish and that he believed that the Defendant understood everything that was being said to him. No evidence was introduced to discredit this evidence.

**WHEREFORE**, for the reasons stated above, it is this 20th day of April 2008, hereby

**ORDERED**, that the Motion to Suppress should be **denied**; and it is further

_____
Gladys Kessler
United States District Judge